Vince R. **MARTIN, Respondent,**

v.

**DIRECTOR OF REVENUE, State OF MISSOURI, Appellant.**

**No. 25761.**

Missouri Court of Appeals, Southern District, Division Two.

July 9, 2004.

Motion for Rehearing or Transfer to Supreme Court Denied July 30, 2004.

Application for Transfer Denied Sept. 28, 2004.

---

Jeremiah W. (Jay) Nixon, Atty. Gen., Lisa J. Berry, Asst. Atty. Gen., Jefferson City, for appellant.

Daniel T. Moore, Moore, Walsh & Albright L.L.P., Poplar Bluff, for respondent.

JOHN E. PARRISH, Judge.

The Director of Revenue (the director) appeals a judgment setting aside the suspension or revocation of Vince R. Martin's (petitioner) driving privileges.[1] Following his arrest for driving while intoxicated, Petitioner's driving privileges were suspended or revoked pursuant to § 302.505.[2] Petitioner requested an administrative hearing as permitted by § 302.530.1, at which the suspension was upheld. He thereafter sought trial de novo in the Circuit Court of Howell County as permitted by § 302.535.1. The circuit court entered judgment setting aside the director's actions and ordering the director to reinstate petitioner's driving privileges. This court affirms.

This case is reviewed pursuant to Rule 84.13(d). "This Court will affirm the trial court's judgment unless there is no substantial evidence to support it, unless the decision is contrary to the weight of the evidence, or unless the trial court erroneously declares or applies the law." (Footnote omitted.) *Verdoorn v. Director of Revenue*, 119 S.W.3d 543, 545 (Mo. banc 2003).

Section 302.505.1 permits the department of revenue to suspend or revoke the driver's license of any person arrested upon probable cause of driving while intoxicated. An aggrieved driver can seek a trial de novo. At the trial the court must determine whether the suspension or revocation is supported by evidence that: (1) the driver was arrested upon probable cause for violating an alcohol-related offense; and (2) the driver's blood alcohol concentration exceeded the legal limit of [the amount speci-

---

1. The record on appeal does not include a copy of petitioner's driving record. The administrative hearing officer's findings of fact and conclusions of law that is part of the record on appeal appears to be a preprinted document that does not identify whether the administrative action was a suspension or revocation of petitioner's driver license, but refers to the administrative action as the giving of a "Notice of Suspension/Revocation." The judgment that is the subject of this appeal refers to the action that is the subject of the trial de novo as "suspending or revoking the license." This court does not encourage the use of forms that fail to identify the action that is the subject of an appeal with particularity. The director's point on appeal, however, refers to the action set aside as "the revocation of [petitioner's] license."

2. References to statutes are to RSMo 2000.

fied by § 302.505].[3] *Section 302.535.1* The "burden of proof" is on the director of revenue to establish grounds for the suspension or revocation by a preponderance of the evidence.[4] *Section 302.535.1*

*Id.*

Petitioner's vehicle was stopped at a sobriety checkpoint in the early morning hours of November 2, 2002. West Plains Police reserve officer James Berkshire spoke with petitioner. Officer Berkshire asked petitioner if he had been drinking. Petitioner replied that he had. Petitioner was asked to step out of his vehicle, after which petitioner was administered field sobriety tests by West Plains Police reserve officer Christopher L. Sterner.

Officer Sterner administered four field sobriety tests. Officer Sterner smelled intoxicants on the breath of petitioner and observed that petitioner's eyes were watery and bloodshot. Following petitioner's poor performance on the field sobriety tests, Officer Sterner arrested him for driving while intoxicated.

Petitioner was transported to the West Plains Police Department where Officer Sterner administered a breath test. Officer Sterner observed petitioner for fifteen minutes before administering the test, during which time petitioner did not consume anything, smoke, place items in or remove items from his mouth, or vomit. Petitioner was instructed how to blow into the DataMaster machine that was being used for the breath test. The operational checklist prescribed by the Missouri Department of Health for the machine's use was completed. Petitioner blew into the machine. The machine reported an invalid "subject sample." The time recorded on the report of the invalid sample was "01:25."

Officer Sterner was asked what he did after the reported invalid sample. He answered, "I set the machine up and asked him, you know, to do another test, but that would be his final chance." Officer Sterner said he instructed petitioner "that he needed to blow into the machine instead of just blowing and stopping and blowing and stopping. That it took eight to ten seconds of not a real strong breath, just a steady breath."

Officer Sterner was asked the following questions and gave the following answers about what occurred while he was setting up the machine for the second test:

Q. Where was the Petitioner as you were setting up the machine again?

A. Sitting in a chair to my left.

Q. Approximately, how far away from you was he?

A. A foot and a half estimated.

Q. You—I'm sorry. Did you observe him the entire time that you were setting up the machine again?

A. I couldn't actually visually observe him the whole time, as I was punching the information into the machine, but, I mean—

. . .

Q. Did you periodically, you know, throughout that, observe the Petitioner?

3. Petitioner was arrested November 2, 2002. The version of § 302.505 then in effect established the applicable blood alcohol content for revocation or suspension as "eight-hundredths of one percent or more by weight."

4. Once the director makes a *prima facie* showing of probable cause of driving while intoxicated, the driver is entitled to present rebuttal evidence to raise a genuine issue of fact regarding the validity of the blood alcohol test results. If the driver chooses to do so, his or her burden is one of production, not persuasion. *Verdoorn, supra* at 546. The burden of proof remains that of the director. *Id.*

A. Yes, sir.

. . .

Q. Okay. So you did observe him, though, for—for—in between the time that you administered the first test and the time that you administered the second test, correct?

A. Yes, sir.

Q. Did you, during that time that you observed him between the two tests, did he—did he consume anything at that time?

A. No, sir.

Q. Did he smoke any cigarettes?

A. No, sir.

Q. Did he place anything into his mouth?

A. No, sir.

Q. What about remove anything out of his mouth?

A. No, sir.

Q. Did he—Did he vomit?

A. No, sir.

Q. Did you notice him burp or belch?

A. He did some belching.

Officer Sterner did not perform the Missouri Department of Health's operational checklist for the machine's use in administering the second test. He did not wait an additional fifteen minutes before performing the second test. The report on the first test showed the time of "01:25." The report on the second test showed the time of "01:29." The second test report stated a "subject sample" result of .166.

The trial court's findings included that petitioner voluntarily submitted to a breath test; that:

The officer completed the initial checklist. The police officer testified he observed [petitioner] belching during the waiting period. [Petitioner] then submitted a breath sample into the machine. The BAC DataMaster registered "invalid sample" on the first test, and the police officer requested a second test. The officer admits he did not complete a second checklist. The attorneys disagree about the exact time period between the tests, but agree the period was from three to six minutes. Over vigorous objections by defense counsel, the results of the second test were introduced into evidence. After the second breath sample was given, the BAC Data-Master registered an alcohol concentration over eight-hundredths of one percent or more by weight.

The trial court further found:

The regulations promulgated by the Director are silent as to what procedure should be followed when an "invalid sample" reading is obtained. [The Trial] Court could end its inquiry by acknowledging that the checklist from the first breath was administered in accordance with the Department of Health regulations; however, under the unique facts of this case, [the Trial] Court believes that a deeper examination of the evidence is required. As strongly argued by [petitioner] and [petitioner's] expert, and as grudgingly admitted by the Director's own expert, a ten to fifteen minute waiting period was necessary after the "invalid test" result to allow the mouth alcohol to dissipate and assure an accurate and reliable second test result.

The trial court included a footnote at the end of the first sentence of the paragraph last quoted above stating:

Pursuant to 19 CSR 25–30 Form 7 (DATAMASTER), a second fifteen minute observation period is required if the subject is observed to vomit during the initial observation period. The term "vomiting" is apparently not defined in

the regulations, and neither party offered evidence of a medical, scientific or other expert definition of that term. Although a common description of "vomit" found in Webster's New Collegiate Dictionary (1977) is "to disgorge (the contents of the stomach) through the mouth," a medical definition of "vomit" includes, "Matter from the stomach that has come up into and may be ejected beyond the mouth, due to the act of vomiting." *See Daniels [v. Director of Revenue*, 48 S.W.3d 42 (Mo.App.2001)], at 45; Medicine Net.com, (defining "vomit"), Nov. 21, 2000, available at *http://www.med-terms.com/script/main/art.asp?l=MNIArticleKey=6005.* Irrespective of the definition of "vomiting," the key issue is whether mouth alcohol is present during the testing. If mouth alcohol is present, the breath test results are compromised and unreliable, and arguably, the test results should not be admitted into evidence.

The trial court concluded the results of the second test were not reliable; that the DataMaster machine indicated possible mouth alcohol present, and the mouth alcohol would not have dissipated within three to six minutes. The judgment announced that "[t]he second test results are excluded from evidence"; that "[t]he Director has failed to meet the statutory required elements of proof." The judgment directed the director to forthwith reinstate petitioner's driving privileges.

The director raises one point on appeal. She contends the trial court erred in setting aside the revocation of petitioner's license; that the trial court's ruling was against the weight of the evidence and was unsupported by substantial evidence. The director argues that she "established a prima facie case showing that the arresting officer had probable cause to arrest [petitioner] for DWI and [petitioner's] breath test result was 0.166 percent." She contends petitioner failed to rebut the *prima facie* case in that he failed to show the second breath analysis was unreliable.

Petitioner presented testimony of Terry Martinez. Dr. Martinez's education includes a doctorate degree in pharmacology, master's degrees in pharmacology and hospital pharmacy, and a bachelor of science degree in pharmacy. He teaches at the St. Louis College of Pharmacy. His teaching responsibilities include teaching all of that school's toxicology courses. Dr. Martinez explained that toxicology is "the amount of a chemical or substance that is known to cause harm." He was asked what area of toxicology petitioner's case involved. He answered that it involved the measurement of alcohol breath samples.

Dr. Martinez noted the type of machine that had been used to test petitioner's blood alcohol content, a "BAC DataMaster breathalyzer machine." He described how the machine worked; how it calculated an approximation of how much alcohol is present in a person's blood. He stated that the device was generally accepted as a test for blood alcohol levels; that "assuming that it's used properly, it [would] give you reasonably accurate results." Dr. Martinez acknowledged that the Missouri Department of Health provided regulations on how to use the device. He explained that if the machine were not properly used, the result would not be reliable.

Dr. Martinez was asked if he was personally familiar with the BAC DataMaster device. He answered that he was; that he had used the machine many times. He stated he had attended the factory of the National Patent, the company that makes the BAC DataMaster; that he attended a three-day course there. When at the fac-

tory, he received the guidelines the manufacturer published for use of the machine.

Dr. Martinez was shown the test result forms the DataMaster produced following both tests administered to petitioner. He was asked what "subject sample invalid" meant that appeared on the form produced from the first test. He explained, "This is generally accepted to mean that it detected a negative movement of the absorption curve. That is interpreted by the machine to mean that it had mouth alcohol present."

Dr. Martinez looked at a publication provided by the DataMaster machine's manufacturer. He reviewed a part of the publication that referred to a test result of "invalid sample." Dr. Martinez stated:

It says, "This message is seen only during a subject or simulated test if conducted during the subject test mode. The instrument has detected a negative going value during the test and the assumption is that there is mouth alcohol present.

This can be caused by a subject blowing too hard as saliva droplets can be forced through the mouthpiece and into the sample chamber causing a somewhat unstable reading. And it is more commonly seen if a subject has a very high alcohol level.

It is very rarely caused by a maintenance difficulty such as dirt in the sample chamber. See section entitled 'DataMaster Sampling System.'

Usually a retest of the subject after a short waiting period, 5 to 10 minutes, will result in a valid test."

Dr. Martinez was asked about the reference in the publication to "mouth alcohol." He stated:

Mouth alcohol would be simply the presence of alcohol in the mouth for any reason, such as recent consumption.

That would be one reason. Another would be regurgitation from the stomach. And that could be as a result of a person's straining too hard trying to deliver alcohol from their stomach—or air from their lungs, and they also deliver alcohol from their stomach up to the glottis. There are specific precautions against having a subject blow too hard.

Dr. Martinez stated that in his experience, based on hundreds of tests on human subjects, it takes a minimum of six or seven minutes to dissipate blood alcohol. He said most mouth alcohol will dissipate in about eight to ten minutes, but a few would go longer. He added, "All mouth alcohol, in my experience, dissipates in about 15 minutes, unless the subject has false teeth or some other foreign object in the mouth that causes retention of mouth alcohol."

Dr. Martinez was asked if he formed an opinion as to whether the second test performed on petitioner was a valid test result. He stated that he had; that his opinion was that it was not a reliable or valid test result.

The director presented rebuttal evidence directed to the validity of the second test. The rebuttal evidence was testimony of Christine Sylva, an employee of the Department of Health and Senior Services. Ms. Sylva works in the State Public Health Laboratory as a public health laboratory scientist. She holds a bachelor of science degree in biology with chemistry. She is trained in the use and functionality of the DataMaster. She stated that she participated in a yearly manufacturer's update on the machine.

Ms. Sylva testified that a fifteen-minute observation period was part of the protocol for administering a breath test. She stated that ten minutes would be sufficient, so fifteen was more than adequate. She was asked if there were any rules or regula-

tions that speak to a second observation of fifteen minutes if a second test is administered. She stated there was no rule or regulation on the subject.

In assessing if there is substantial evidence, we must defer to the trial court on factual issues and cannot substitute our judgment for that of the trial judge. *Thurmond v. Director of Revenue*, 759 S.W.2d 898, 899 (Mo.App.1988). Such deference is not limited to the issue of credibility of witnesses, but also to the conclusions of the trial court. *Kitchens v. Missouri Pacific Railroad Co.*, 737 S.W.2d 219, 222 (Mo.App.1987).

Appellate courts view the evidence in the light most favorable to the trial court's judgment, *Thurmond*, 759 S.W.2d at 899, and we deem all facts to have been found in accordance with the result reached by the trial court. *Askins v. James*, 642 S.W.2d 383, 386[2] (Mo.App.1982). A trial court is accorded wide discretion even if there is evidence that would support a different result. *Thurmond*, 759 S.W.2d at 899. In a driver's license revocation case, a trial court has the prerogative when weighing witness credibility, to accept or reject all, part, or none of the testimony of any witness. *Id.*

*Hawk v. Director of Revenue*, 943 S.W.2d 18, 20 (Mo.App.1997).

The trial court's judgment was not against the weight of the evidence. It was supported by substantial evidence. The director made a *prima facie* case in support of its action suspending or revoking petitioner's driver's license; however, the evidence presented by petitioner was sufficient to raise a genuine issue of fact regarding the validity of the blood test results. Although the director presented rebuttal evidence, the trial court obviously found that evidence less credible than the evidence adduced by petitioner. The trial

court's determinations were within the prerogative afforded it as the trier of fact. The director's point on appeal is denied. The judgment is affirmed.

SHRUM and BATES, JJ., concur.